U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

MAR 12 2012

CLERK, U.S. DISTRICT COURT
by_____
              Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| RENAISSANCE HOSPITAL | § | |
| GRAND PRAIRIE, INC. d/b/a | § | |
| RENAISSANCE HOSPITAL | § | |
| GRAND PRAIRIE, ET AL., | § | Bankruptcy Court Case |
| | § | No. 08-43775-DML-7 |
| Debtors. | § | |
| | § | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | § | |
| | § | |
| FIRST NATIONAL BANK, ET AL., | § | |
| | § | |
| Appellants, | § | |
| | § | District Court Case |
| VS. | § | No. 4:11-CV-311-A |
| | § | |
| AARK COMPANIES, L.L.C., ET AL., | § | |
| | § | |
| Appellees. | § | |

MEMORANDUM OPINION
and
ORDER

The above-captioned district court action is an appeal from

an amended judgment of the United States Bankruptcy Court in the

above-captioned bankruptcy case signed by United States

Bankruptcy Judge D. Michael Lynn and entered on January 31, 2011

("Judgment"). Appellants are First National Bank ("FNB") and

MetroBank, N.A. ("MetroBank") (collectively, "Lenders"), which

have named as appellees AARK Companies, L.L.C., JMC Mechanical,

Inc., Jesus Vera d/b/a Elite Construction, Metropolitan

Professional Electrical Services, Inc. d/b/a Metro Electric
("Metro Electric"), Crescent Electric Supply Company
("Crescent"), Hajoca Corporation d/b/a Easter & Sons Supply
("Hajoca/Easter"), Innovative Plumbing Services, Inc. ("IPS"),[1]
and York International Corporation.  Hajoca/Easter and Crescent
each has filed a cross-appeal in which Lenders are the cross-
appellees.

After having considered the briefs of the parties, the
record on appeal, and pertinent legal authorities, the court has
concluded that (1) the bankruptcy court erred in ruling that the
mechanic's liens of Metro Electric and IPS had priority over the
liens of Lenders, (2) judgment should be rendered establishing
that Lenders' liens have priority over, and are superior to, the
mechanic's liens of Metro Electric and IPS, and (3) the
bankruptcy court erred in rendering a money judgment against
Lenders in favor of Metro Electric, and such money judgment
should be reversed, and a ruling should be made that Metro
Electric is not entitled to any recovery from Lenders.

---

[1]Innovative Plumbing Services, Inc. ("IPS") was not a party to the bankruptcy proceedings that led to the judgment from which the appeal has been taken; however, findings, conclusions, and rulings that were made by the bankruptcy court had the potential to affect the financial interest of IPS. Appellants in their brief designated IPS as an appellee.  The court questions the propriety of that designation.  However, IPS conducted itself as if it were an appellee by timely filing a brief in response to appellants' brief.  On March 7, 2012, IPS filed a motion to intervene in this appeal as an appellee.  The court granted that motion, so that for all purposes IPS is an appellee in this appeal.

I.

## Abbreviated Description of the
## Bankruptcy Court's Findings, Conclusions, and
## Rulings at Issue

The issues resolved by the Judgment were raised by Lenders by documents they filed in the bankruptcy case titled "Joint Motion Under Bankruptcy Rule 9019 to Approve Compromise and Settlement With First National, N.A. and MetroBank, N.A." (the "9019 Motion") and "Notice of Objections of MetroBank, N.A. and First National Bank of Edinburg, Texas to Lease and M&M Lien Claims" (the "Objections"), respectively.

Facts relevant to the Judgment were set forth in a Partial Summary Judgment issued by the bankruptcy court on January 26, 2010, in which the bankruptcy court found the following facts to be undisputed:

> 1.    Renaissance Hospital - Grand Prairie, Inc. ("Debtor") acquired certain real estate, existing improvements and related property from DFW Grand Prairie Medical Center, Ltd., pursuant to a Special Warranty Deed with Vendor's Lien, which was recorded on September 1, 2006.  A vendor's lien secured the payment of a note in the amount of $7 million payable to MetroBank. This loan to MetroBank was further secured by, among other things, a deed of trust, dated August 31, 2006 and filed for record in Tarrant County, Texas, on September 1, 2006.  The deed of trust filed of record on September 1, 2006 contains a future advances clause.

3

      2.   As of the Petition Date, Lenders were owed $34,033,053.37, which amount is secured by a deed of trust filed of record on September 1, 2006.

R. at 3841.  (Related undisputed facts not recited in the

Judgment are that (1) the Special Warranty Deed With Vendor's

Lien by which Debtor acquired ownership of the real estate on

which the improvements in question were to be made indicates that

it was signed August 31, 2006, to be effective that date, (2) the

deed of trust securing the loan to MetroBank shows that it was

signed on August 30, 2006, to be effective August 31, 2006; and

(3) FNB's interest in the loan made by MetroBank to Debtor arose

from its purchase from MetroBank of an undivided participation in

the loan.)

    In the Partial Summary Judgment, the bankruptcy court made

the legal rulings that:

      3.   The effective date of the lien securing the entire debt [owed to Lenders] is September 1, 2006, including advances after that date.  Advances made by the Lenders including, without limitation, the February 2007 construction loan, relate back to and are secured by the deed of trust filed of record on September 1, 2006.

      4.   Absent the existence of a general contract arrangement, the inception date of a Lien Claimant's lien does not relate back to and so is not established by the date on which any other Lien Claimant performed

its first visible work or delivered its first visible materials.

R. at 3841.  As the legal conclusions imply, the outcome of the dispute between the parties turns on whether the liens created by the vendor's lien and deed of trust for the benefit of MetroBank have priority over the statutory mechanic's liens of those who provided labor and materials for work on improvements on the real property in question ("M Lien Claimants") for Debtor.  (The record establishes without dispute that the primary structure on the real estate for which the M Lien Claimants claim they provided labor and material was an abandoned multi-story hospital building, which had been vacant for nine years and was in a serious state of disrepair, having been trashed and damaged by vandals and others.[2]  R. at 2796, 2798-2800, 2801-04, 3269-70. The buildings on the real estate were without electrical power or water supply.  The hospital structure (the "Hospital") was to be restored by Debtor for use as a hospital.)

The bankruptcy court anticipated in the Partial Summary Judgment the future trial proceedings that led to the Judgment, and, in the course of doing so, recognized, and gave effect to, stipulations the M Lien Claimants had made, and filed in the

---

[2]Apparently several buildings were on the real estate, with the most significant building being the abandoned hospital structure.

bankruptcy court on November 23, 2009, as to facts pertinent to

the inception dates of their respective claimed mechanic's liens,

R. at 5628, ruling in the Partial Summary Judgment that:

> Lender's [sic] Motion for Summary Judgment . . .
> against . . . Hajoca Corporation d/b/a Easter & Sons
> Supply, Innovative Plumbing Services, Inc., . . . is
> hereby granted, as set forth below.
>
> . . . .
>
> 5.   To the extent that any Lien Claimant,
> specifically including Metro Electric has not <u>by</u>
> <u>stipulation</u> . . . become estopped from doing so, such
> Lien Claimant may at trial present evidence in support
> of the inception of its lien that it performed its
> first visible work or delivered its first visible work
> or delivered its first visible materials (as defined by
> section 53.124 of the Texas Property Code and Texas
> case law) prior to the filing of the deed of trust
> filed of record on September 1, 2006.

R. at 3841-42 (emphasis added).[3]  A principal ground of Lenders'

motion for summary judgment was that certain M Lien Claimants,

including IPS, Hajoca/Easter, and Crescent, had stipulated that

they did not perform work or deliver materials to the Hospital

---

[3]Language in the August 25, 2010 post-trial memorandum opinion of the bankruptcy court
indicates that the bankruptcy judge considered that his rulings at the summary judgment stage were being
carried forward, explaining:

> By the Letter Ruling [December 29, 2009]and the Prior Order [Partial Summary
> Judgment], the court narrowed the issues for trial and made factual findings which
> pertain to issues resolved by this memorandum opinion.  The court subsumes the Letter
> Ruling and the Prior Order into this memorandum opinion.  In the Letter Ruling and the
> Prior Order, the court specifically found facts relating to the amount and inception dates
> of the Lenders' Lien; because these facts were established in the Letter Ruling and the
> Prior Order, and prior to trial, evidence respecting these facts was not necessarily
> presented to the court  during the trial.

R. at 3891 n.12.

renovation/restoration project until after September 1, 2006, the date when Lenders' liens were perfected.  R. at 4609.

Confirming that the bankruptcy court intended to give effect to the stipulations of the M Lien Claimants are comments made by the bankruptcy judge on the record during the course of the trial conducted April 6, 7, 19, and 20 and May 6, 2010, on issues remaining to be resolved.  During the questioning of a witness relative to when an M Lien Claimant commenced work on the Hospital project, the bankruptcy court reminded the parties, through their attorneys, that they were stuck with the stipulations, and that that would be his ruling on that issue going forward.  R. at 3481-82.  He added that his ruling "will apply to evidence with respect to any of the M&M lien claimants." R. at 3482.  The bankruptcy judge reiterated those comments at a later point in the trial, specifically as to any claim Hajoca/Easter might make through assignment from IPS.  R. at 3563.

After the conclusion of the April/May 2010 trial the bankruptcy court issued a memorandum opinion on August 25, 2010, stating further findings of fact and conclusions pertinent to the Judgment.  The bankruptcy court found and concluded that there

was no general contractor[4] during the renovation/restoration of
the Hospital.[5] (As a consequence, the priorities of the lien
claims of the parties are determined by sections 53.123 and
53.124(a) and (b) of the Texas Property Code, which reads, in
pertinent part, as follows:

> § 53.123.  Priority of Mechanic's Lien Over Other
> Liens
>
> (a) Except as provided by this section, a
> mechanic's lien attaches to the house, building,
> improvements, or railroad property in preference to any
> prior lien, encumbrance, or mortgage on the land on
> which it is located . . . .
>
> (b) The mechanic's lien does not affect any lien,
> encumbrance, or mortgage on the land or improvement at
> the time of the inception of the mechanic's lien
> . . . .
>
> § 53.124.  Inception of Mechanic's Lien
>
> (a) . . . [T]he time of inception of a mechanic's
> lien is the commencement of construction of
> improvements or delivery of materials to the land on
> which the improvements are to be located and on which
> the materials are to be used.
>
> (b) The construction or materials under Subsection
> (a) must be visible from inspection of the land on

---

[4]Two Debtors, Renaissance Hospital Grand Prairie, Inc. ("RGP") and Renaissance Healthcare
Systems, Inc. ("RHS") were involved in the ownership and renovation/restoration of the hospital
building.  Both were owned by the de La Garza family or through family trusts or trusts of individual
members of the family.  The two entities were related, and were classified and treated as brother/sister
corporations.  The bankruptcy court found that a general contractor relationship did not exist between
RGP and RHS in relation to the renovation/restoration work.  R. at 3892-94, 3899-3903.

[5]Specifically, the bankruptcy court found and concluded "that, there being no general contract
respecting renovation of the Hospital, the M&M Liens of the Lien Claimants that commenced work after
Lenders' Inception Date cannot relate back prior to that date."  R. at 3903.

which the improvements are being made.

Tex. Prop. Code §§ 53.123 & 53.124(a) & (b) (Vernon 2007)).

After noting that in order to prevail against Lenders each M Lien Claimant had the burden to prove by a preponderance of the evidence that its lien had its inception before September 1, 2006, the effective date of Lenders' liens, the bankruptcy court found that M Lien Claimants Metro Electric and IPS (through Hajoca/Easter as its assignee) had carried their burdens of proof.[6] Also, the bankruptcy court found that M Lien Claimants Crescent and Hajoca/Easter[7] each failed to carry its burden to prove that its lien had an inception before September 1, 2006, with the consequence that their liens are subordinate to the liens of Lenders. A conclusion expressed by the bankruptcy court was that even though Crescent and Hajoca/Easter supplied materials to Metro Electric and IPS, respectively, the liens of Crescent and Hajoca/Easter did not relate back to the inception dates of the Metro Electric and IPS mechanic's liens, leading to the bankruptcy court's conclusion that Crescent and Hajoca/Easter

---

[6]While the bankruptcy court made specific findings that Metro Electric and IPS began work at, and supplied materials for use in, the renovation of the Hospital before the inception of the liens of Lenders, thus satisfying the section 53.124(a) element as to the inception date of a mechanic's lien, he did not make any "visibility" finding, which would be required for establishment of the section 53.124(b) element that the construction or materials "must be visible from inspection of the land on which the improvements are being made." See R. at 3904, 3906-07.

[7]The bankruptcy court referred to Hajoca Corporation d/b/a Easter & Sons Supply sometimes as "Easter" and sometimes as "Hajoca."

each must rely on the date on which it first did work or supplied materials for the project.  R. at 3906-07.

As a corollary to the ruling that Metro Electric's lien takes priority over, and is superior to, the liens of Lenders, the bankruptcy court ordered, pursuant to the holding of the Texas Supreme Court in Diversified Mortgage Investors v. Blaylock, 576 S.W.2d 794, 807-08 (Tex. 1978), that Metro Electric have judgment against Lenders, jointly and severally, in the amount of $1,450,621.31, plus court costs and post-judgment interest.[8]  R. at 3914-15.

In the bankruptcy court's December 29, 2010 memorandum opinion, the bankruptcy court again devoted attention to the stipulations of the M Lien Claimants concerning inception dates of their respective mechanic's liens.  The bankruptcy court pointedly said "IPS is not bound by the Stipulation because it did not sign it,"[9] but that "Hajoca is, however, bound by the

---

[8]The bankruptcy court lifted the stay to authorize Lenders to foreclose their liens on the real property, R. at 5583-93; and, in March 2009 Lenders caused there to be a trustee's sale of the real property under the power-of-sale provisions contained in the deed of trust at which they credit bid the amount of $27,000,000.00 for the property, R. at 4640.  While the parties have not discussed the terms of the sale, the court assumes that the foreclosure sale was conducted under circumstances that caused the title to the real property to be cleansed of all liens of the M Lien Claimants.

[9]There is no indication that the bankruptcy court considered that IPS could be bound by the stipulation made in its name by Hajoca/Easter based on the privity between the two of them arising from the assignment by IPS to Hajoca/Easter of an interest in IPS's mechanic's lien, which interest was being asserted by Hajoca/Easter in the bankruptcy court proceedings.  See, e.g., Sprint v. APCC Servs., Inc., 554 U.S. 269 (2008).

Stipulation--including to the extent that Hajoca would be entitled to proceeds paid to IPS."  R. at 3914.

## II.

### Issues Raised by the Parties to the Appeal

A.   Issues Raised by Lenders

Lenders presented three issues for review on appeal, worded as follows:

### Issue One

The bankruptcy court erred in overruling the Objections to Innovative Plumbing Services, Inc.'s ("IPS") mechanic's and materialmen's liens, after disregarding the written stipulation of IPS to the effect that it "performed its first visible work or delivered its first visible materials (as defined by section 53.124 of the Texas Property Code and Texas case law)...on or after October 9, 2006 but before February 22, 2007," because such stipulation was made under authority of IPS's assignee's counsel and would mean that IPS's lien was subordinate to that of MetroBank, N.A., and First National Bank as a matter of law. (NR.3886-3919; Ex. H NR 172-177; NR.5627-5630).

### Issue Two

The bankruptcy court erred in overruling the Objections to Innovative Plumbing Services, Inc.'s ("IPS") mechanic's and materialmen's liens, after finding that IPS had commenced work on the site prior to September 1, 2006, because IPS's activity at the site prior to September 1, 2006, did not constitute visible construction work as a matter of law. (NR.3886-3919).

### Issue Three

The bankruptcy court erred in overruling the Objections to Metropolitan Professional Electrical Services d/b/a Metro Electric ("Metro Electric") mechanic's and

11

materialmen's liens, after finding that Metro Electric
had commenced work on the site prior to September 1,
2006, because Metro Electric's activity at the site
prior to September 1, 2006, did not constitute visible
construction work as a matter of law. (NR.3886-3919).

Br. of Lenders at 1-2.

B.    Issues Presented for Review by Way of Cross-Appeal by
      Crescent

       Crescent presented, by way of cross-appeal, two issues for

review worded as follows:

### Issue One

The bankruptcy court erred in sustaining the Lenders'
Objections with respect to Crescent's MMLien by ruling
Crescent's lien is subordinate to the liens of the
Lenders. This ruling is contrary to TEX. PROP. CODE ANN
§53.122-124 because Crescent contracted directly with
Metropolitan Professional Electrical Services, Inc.
("Metro") to supply materials to Metro on the subject
Project and the Court ruled that Metro performed
visible work and provided visible materials prior to
the date of the filing of Lenders Deed of Trust. Thus,
Crescent's MMLien should also take priority over and be
superior to the liens of Lenders. R. 3849-3871; 3873-
3878; 3880-3882.

### Issue Two

The bankruptcy court erred in its determination that
Crescent was estopped from presenting evidence at trial
that it delivered materials to the land on which the
improvements were located and were to be used because
the Stipulation entered into by Crescent was to be used
for the purposes of the Summary Judgment Proceedings,
only, substantial evidence presented in at [sic] trial
in the case by Metro and Crescent is contrary to the
Stipulations and discovery had not yet been completed

at the time the Stipulation was filed. R. 3840-3842;
3844-3847; 38493871; 3873-3878; 3880-3882.

Am. Br. of Crescent at 1-2.

C.    <u>Issues Presented for Review by Way of Cross-Appeal by
      Hajoca/Easter</u>

      Hajoca/Easter presented, by way of cross-appeal, two issues

for review worded as follows:

      A. Issue One

      The bankruptcy court erred in failing to find that
      IPS's MMLien, which was subsequently assigned to
      Hajoca, took priority over and is superior to the liens
      of Lenders because IPS performed visible work and
      provided visible materials on the Project prior to the
      Lenders' filing of their Deed of Trust on September 1,
      2006 and performed visible work and delivered visible
      materials to the Project prior to September 1, 2006.
      R.3911; 3917.

      B. Issue Two

      The bankruptcy [court] erred in failing to render a
      money judgment in favor of IPS against MetroBank, N.A.
      and First National Bank, N.A. a/k/a First National Bank
      of Edinburg, Texas, jointly and severally, in the
      amount of IPS' [sic] lien of $509,195.26 (which was
      subsequently assigned to Easter), plus court costs,
      with all to bear interest at the rate allowed by 28
      U.S.C. §1961 from the date of Judgment until the date
      paid, because the court found that the Lenders'
      Objections to IPS' [sic] MMLien were overruled, the
      lien of IPS, subsequently assigned to Hajoca,
      transferred, attached to the $27,000,000.00 proceeds of
      the Lenders' foreclosure sale, and in such a
      circumstance, the remedy is a money judgment in favor

```
        of IPS[.]   R. 3849-3871; 3873-3878; 3880-3882. R. 145-
        167; RI69-174; and R. 176-178.
```

Am. Br. of Hajoca at 12-13.

### III.

### Analysis

A.   <u>Priority Issues as Between Lenders and Metro Electric
     and IPS</u>

Under this subheading, the court discusses the issues

presented by Lenders in their brief as Issues Two and Three,[10]

<u>supra</u> at 11-12, and indirectly presented by Issue One in

Crescent's cross-appeal, <u>supra</u> at 12, and by Issue One in

Hajoca/Easter's cross-appeal, <u>supra</u> at 13.

The court will discuss separately, under subsequent

headings, the question of the effect to be given to the

stipulations made in the name of IPS by Hajoca/Easter, through

its attorney, and by Crescent.   R. at 5628-29.

---

[10]While the wording of Lenders' issues could suggest that the only complaint Lenders make as to their Issues Two and Three is that the activities that the bankruptcy court found commenced prior to September 1, 2006, were not visible within the meaning of section 53.124(b), the arguments Lenders advance in support of those issues make clear that the intent of Lenders is to question (a) the correctness of the bankruptcy court's rulings as to the time-of-commencement-of-construction element contemplated by section 53.124(a) as well as (b) the existence of evidence that would support a finding in favor of Metro Electric or IPS as to the visibility element contemplated by section 53.124(b). Br. of Lenders at 11, 23, 26.

The court is treating Lenders' Issues Two and Three as complaining of any finding or conclusion of the bankruptcy court that the mechanic's liens of Metro Electric and IPS had priority over the liens of Lenders for the reasons that the record would not support a finding in favor of either IPS or Metro Electric as to either of the elements spelled out in section 53.124 as being essential to a valid conclusion that its lien had its inception before the September 1, 2006, effective date of Lenders' liens.

1.   <u>Pertinent Legal Authorities</u>

As noted above, section 53.123(b) of the Texas Property Code
provides that a "mechanic's lien does not affect any lien,
encumbrance, or mortgage on the land or improvement at the time
of the inception of the mechanic's lien . . .," and sections
53.124(a) and (b) provide that "the time of inception of a
mechanic's lien is the commencement of construction of
improvements or delivery of materials to the land on which the
improvements are to be located and on which the materials are to
be used" if such "construction or materials . . . [are] . . .
visible from inspection of the land on which the improvements are
being made."  The bankruptcy court correctly held that to
establish priority over Lenders' liens, each M Lien Claimant had
the burden to prove by a preponderance of the evidence that its
lien had its inception before September 1, 2006, and that, absent
the existence of a general contract arrangement, the inception
date of an M Lien Claimant's lien does not relate back to, and is
not established by, the date on which another M Lien Claimant
performed its first visible work or delivered its first visible
materials.  R. at 3841, ¶ 4, 3896-97.  And, the bankruptcy court
correctly held that a general contract relationship did not exist
during the renovation/restoration of the Hospital, with the
consequence that each lien claimant was obligated to prove that

15

it commenced visible work, or delivered visible material, before
September 1, 2006.  R. at 3899, 3903.

As the Texas Supreme Court explained in <u>Diversified Mortgage</u>
<u>Investors v. Lloyd D. Blaylock General Contractor, Inc.</u>, the
analysis to determine the inception of a mechanic's lien under
the statute does not end with establishment of the "visibility"
standard, because when the statutes governing mechanic's liens
are read together, they "clearly provide[] additional standards
or conditions which must exist before a mechanic's lien is
incepted."  576 S.W.2d 794, 801 (Tex. 1978).  In <u>Diversified</u>, the
Court distinguished between preliminary or preparatory activities
or structures, on the one hand, and the placing of something of
permanent value on the land, on the other, <u>id.</u> at 802, holding
that preliminary or preparatory work does not constitute
commencement of a construction project, <u>id.</u>  As to the delivery
of material to the land, the Court explained:

> [I]n order for the delivery of material to constitute
> the inception of a lien, the court must find: (1) that
> there has been a delivery of material to the site of
> construction; (2) that such material is visible upon
> inspection of the land; and (3) that such material
> constitutes either (a) material which will be consumed
> during construction or (b) material which will be
> incorporated in the permanent structure.

<u>Id.</u> at 803.

16

Applying those principles to the facts related to one of the two construction projects involved in <u>Diversified</u> (the Fort Worth property), the Court held that the activities performed on that project were insufficient to constitute commencement of construction of improvement even though the activities consisted of "subsurface investigation, topographical survey work, the spreading of fill dirt, staking, erection of batter boards, excavation for a retaining wall, and erection of a sign." <u>Id.</u> The Court said that "[s]uch activities constitute merely preliminary or preparatory work for construction and do not constitute the actual commencement of construction." <u>Id.</u> The Court added that actual construction on that project did not begin until foundation work was begun on the property. <u>Id.</u> A similar holding was made as to material delivered to the site that was to be used in preparation for the construction:

> Similarly, the material delivered to the site is not of the character to give rise to the inception of a lien. Such material included bundles of stakes and fill dirt. None of this material ultimately formed part of the permanent structure or was consumed in such construction, but was merely preliminary or preparatory material used prior to actual construction.

<u>Id.</u>

In <u>Diversified</u>, the Court held that the lien of a deed of trust recorded after the preliminary or preparatory work was done and material was delivered, but before the actual commencement of

17

construction, had priority over the mechanic's lien of the
contractor who contended that his mechanic's lien related back to
the date of commencement of the preliminary or preparatory work
and material delivery.

Hajoca/Easter seeks to minimize the significance of
Diversified by noting that in Diversified the Court was
interpreting Article 5459 of the Texas Revised Civil Statutes
Annotated, the statutory predecessor to section 53.124, noting in
particular that Article 5459 contained, while section 53.124(a)
does not, the word "actual" before the word "commencement of
construction," and that in the conversion of Article 5459 to
section 53.124(a) the Legislature added the words "on which the
materials are to be used." Am. Br. of Hajoca/Easter at 8-9.
This argument by Hajoca/Easter overlooks the statutory history
that the rewording of Article 5459 when it was codified into the
Texas Property Code as section 53.124 was not intended to
accomplish any substantive change in the law. The action taken
by the Legislature in 1983 of repealing Article 5459 and
replacing it with Texas Property Code section 53.124(a) expressly
stated that "[t]his act is intended as a recodification only, and
no substantive change in the law is intended by this Act." Act
of May 25, 1983, 68th Leg., R.S., ch. 576, §§ 1, 6, 7, 1983 Tex.
Sess. Law Serv. 3547, 3729-30 (West). Such a statement of

legislative intent must be honored by the courts.  See Pruett v.
Harris County Bail Bond Bd., 249 S.W.3d 447, 455 (Tex. 2002);
Cities of Austin, Dallas, Ft. Worth, and Hereford v. Southwestern
Bell, 92 S.W.3d 434, 444 (Tex. 2002).

The United States District Court for the Southern District
of Texas in In re Jamail, 471 F. Supp. 441, 443 (S.D. Tex. 1979),
recognized and gave effect to the "preliminary task" and
"commencement of construction" distinction enunciated in
Diversified.  Texas is not alone in recognizing the preliminary
or preparatory versus commencement of construction distinction
articulated in Diversified.  For decades the courts of other
jurisdictions have recognized, and given effect, to the same
principle.  See, e.g. Roy Bldg. and Loan Ass'n v. King, 22 Del.
Co. 297, 17 Pa. D. & C., at *87-88 (1931); Carr-Cullen Co. v.
Deming, 222 N.W. 507, 507-08 (Minn. 1928); Dickason Goodman
Lumber Co. v. Foresman, 251 P. 70, 72 (Okla. 1926) (emphasizing
that the activity on the land "must be some definite visible work
. . . sufficient to make manifest to all persons who might
propose either to purchase or acquire liens on the property that
a building is commenced." (emphasis added)); George M. Newhall
Eng'g Co. v. Egolf, 185 F. 481, 483 (3d Cir. 1911) (noting that
the purpose of the visibility requirement of a mechanic's lien
statute is clear, and that "[t]o allow a half day's [preliminary]

work . . . to jeopardize the lien of a mortgage, on the ground
that the mortgagee was bound to take notice thereof as the
visible commencement of a building operation, would be
unreasonable and out of accord with everyday experience" and that
the mechanic's lien claimant cannot establish commencement of
construction by pointing to "an equivocal act of a few hours of
tearing down work which is not necessarily, or even usually, an
indication of the commencement of the work of building.");
Central Trust Co. v. Cameron Iron & Coal Co., 47 F. 136, 138
(C.C.W.D. Pa. 1891) (noting that any other result would be
unreasonable and inequitable); Brooks v. Lester, 36 Md. 65, 1872
WL 5674, at *3 (Md. 1872) (noting that the visibility requirement
in a mechanic's lien statute means "some work and labor on the
ground, the effects of which are apparent, easily seen by every
body, such as beginning to dig the foundation, or work of like
description, which every one can readily see and recognize as the
commencement of a building." (emphasis added)).

Upon reviewing cases similar to those cited above, a
Maryland court in Rupp v. Earl H. Cline & Sons, Inc. summed up
the sense of court decisions as follows:

> These cases make it clear that before there can be
> the *commencement of a building* which would give a
> mechanics' lien claimant a preference over a recorded
> mortgage there must be (i) a manifest commencement of
> some work or labor on the ground which every one can

>      readily see and recognize as the commencement of a
>      building and (ii) the work done must have been begun
>      with the intention and purpose then formed to continue
>      the work until the completion of the building.

188 A.2d 146, 149 (Md. 1963).  The Maryland court gave special

attention to whether there was work on the ground that would

"have the effect of putting the party making the construction

loan on notice that the building had been commenced."  Id. at

150.  For more than a century the courts have emphasized the

importance that the activity that is claimed by a mechanic's lien

claimant to be commencement of construction be of such a nature

that a potential mortgagee, inspecting the land, would have seen

something "which he would readily have recognized as the

commencement of a building."  Kelly & Martin v. Rosenstock, 45

Md. 389, 1876 WL 6924, at *1 (Md. 1876).

   The court interprets the applicable case authorities to

stand for the proposition that for a mechanic's lien claimant to

establish priority of its lien over a mortgage lien, the

mechanic's lien claimant not only must prove that before the

mortgage was perfected he did work on the land that was, in fact,

a part of the commencement of construction of improvements, and

not merely preliminary or preparatory to construction of the

improvements, but also must prove that the work done and its

purpose were sufficiently visible to the potential mortgagee

that, upon reasonable inspection, the potential mortgagee would
perceive before the mortgage was perfected that construction of a
building on the premises had commenced, or, as applied, to the
facts of the instant case, that the construction project of
renovating and restoring the building had commenced.  Neither
Metro Electric nor IPS (acting through Hajoca/Easter as its
assignee) met such a standard at trial.

     2.     <u>The Record Does Not Support Findings Leading
to a Conclusion That Metro Electric's Lien
Claim Had its Inception Before September 1,
2006</u>

There is persuasive, indeed the most credible, evidence that
Metro Electric did not engage in any construction activity on the
property in question before September 1, 2006.  However, Metro
Electric did adduce testimony at the trial that it engaged in
certain activities on the land before that date.  Even if that
evidence were to be accepted as accurate, Metro Electric would
not have provided credible evidence that would support findings
leading to the conclusion that the inception date of its
mechanic's lien was before September 1, 2006, because, even
accepting the evidence presented by Metro Electric, the
activities in which it says it engaged before September 1, 2006,
were, at best from Metro Electric's standpoint, preliminary or
preparatory to the later commencement of the project of

renovating and restoring the Hospital and related structures. And, giving Metro Electric the benefit of the evidence it adduced, the record nevertheless would not support a finding that the things Metro Electric claims it did before September 1, 2006, would have satisfied the visibility requirements. The work Metro Electric claims it did would not have put the prospective mortgagee, MetroBank, on notice from an inspection of the property that the project of renovation and restoration of the Hospital property commenced before Renaissance purchased the property, and obtained the purchase money loan from MetroBank, on August 31, 2006.

The evidence pertinent to the claim now being made by Metro Electric that the inception of its mechanic's lien was before September 1, 2006, can be summarized as follows:

On September 11, 2009, Metro Electric, acting through Micky Cable ("Cable"), answered an interrogatory contained in a set of written interrogatories that had been served on it by MetroBank, asking for a statement of "the date that [Metro Electric] contend[s] was the inception date for the purpose of the priority of any lien claimed by [Metro Electric]," by saying that "Metro Electric first performed labor, delivered materials and commenced work on the project on or about September 13, 2006." R. at 563. That answer was made under the oath of Cable as an authorized

officer of Metro Electric.[11]  R. at 568.  The September 2009
interrogatory answer by Metro Electric was consistent with, and
confirmed, a representation Metro Electric, through its counsel,
made to counsel for Lenders in a letter dated February 5, 2009,
in which Metro Electric said that it "commenced work on the
project on or about September 18, 2006," and added that it
"claims that the inception of its mechanic's and materialman's
lien relates back to the date labor was first performed or
materials were first delivered to the project, which [Metro
Electric] currently believes was on or about September 4, 2006."
R. at 2118.

Walter Boggan ("Boggan"), the employee of Debtor who helped
evaluate on behalf of Debtor before Debtor purchased the property
on August 31, 2006, the work that would have to be done to
renovate/restore the property, testified that construction on the
project did not start until after September 1, 2006, R. at 3138,
and that Metro Electric did nothing on the property before
September 2006 other than to come to the project and look at it,

---

[11]In November 2009 Metro Electric filed a supplemental response to the interrogatory mentioned
in the text, again made under the oath of Micky Cable as president of Metro Electric, changing the
answer to say that "Metro Electric first performed labor, delivered materials and/or commenced work on
the project in June 2006" and "Metro Electric additionally performed labor, delivered materials and
worked on the project in August of 2006 and thereafter." R. at 3132, 3134.  While the supplemental
answer prevented Metro Electric from being estopped by its first answer from offering testimony at trial
at variance with its first answer, the supplemental answer does not constitute probative evidence in
support of Metro Electric's contention that its lien had an inception date before September 1, 2006.  See
Lobel v. Am. Airlines, 192 F.2d 217, 221 (2d Cir. 1951).

R. at 3307.   Before September 1 there was no power at the
facility, and another electrical company, JW Electric, was hired
to provide temporary lighting so that they could see the
facility; however, no temporary lights were installed at the
Hospital before September 1, 2006.   R. at 3128-29.

Boggan's deposition, which was received into evidence at the
trial, conformed, on an abbreviated basis, with his trial
testimony.   R. at 2273-2316.   The deposition testimony makes
clear that the activities of Boggan at the property before his
employer acquired ownership of it on August 31, 2006, were for
the purpose of evaluating the property for possible purchase,
including obtaining an understanding of the approximate cost of
renovating/restoring of the property if it were to be purchased.
R. at 2301-02, 2304-07, 2312-14.   He said that if Metro Electric
was on the property before September 1, 2006, it was to give a
bid on the switchgear.   R. at 2314.

Cable, who said he owns, and is president of, Metro
Electric, testified that he was initially contacted by Boggan to
work on the project in May 2006, that Boggan told him that they
were in the process of purchasing the property to
renovate/restore it, and that Boggan wanted Metro Electric to
look at the project to see if they could get power to a part of
the project.   R. at 3440-41.   He said that he went to the

property by himself on June 6, 2006, to start looking at the
switchgear, which had been vandalized.  The switchgear is similar
to a breaker box, but much larger, and supplied power to a
section of the Hospital.  Cable testified that he and another two
workers took several hours to evaluate the switchgear and
determine what would be required.  R. at 3443-46.

According to Cable, in June 2006 Metro Electric, at the
request of Boggan, ran 175 feet of wire into a flooded tunnel to
see if sump pumps in the tunnel could be made operational.  R. at
3446-48.  He also testified that in August 2006 Boggan asked him
if he would look at the security lights in front of the north
tower of the building to see if they could get them working.  R.
at 3449-53.  Cable maintained in his testimony that Metro
Electric did visible work on the job before September 1, 2006,
because the switchgear sat in the middle of the floor of its
room, and anybody that would have walked into the building would
have seen that they were working on it, and that the wire that
ran into the tunnel was visible.  R. at 3448-49.  A fair
summation of Cable's testimony is that his claim of work done by
Metro Electric on the property before September 1, 2006, is that
at the request of Boggan they tried to get the switchgear
operational so that there would be some power in the structure,
they ran a wire to sump pumps in a tunnel in an unsuccessful

effort to cause them to operate, and Cable discussed doing work
on outside lighting.

So far as the court can determine, none of the Metro
Electric invoices admitted at the hearing showed any work done by
Metro Electric on the Hospital property before September 1, 2006.
One of the invoices in evidence showed work done in May 2006, but
the invoice shows on its face that the work was done at Debtor's
hospital facility in Dallas, Texas.  R. at 443.  The other
invoice is dated September 17, 2007, and shows work done at the
property in question at a total cost of $270,709.98 during the
month of September 2007.  R. at 2034-38.  It seems that the only
items produced by Metro Electric that Cable claimed provided
documentation for any work it said it did on the property in
question before September 1, 2006, were five sheets of paper that
collectively were marked Exhibit 107.  R. at 2103-07.  The first
showed the purchase by Metro Electric from Elliott Electric
Supply on June 9, 2006, of 250 feet of what Cable described as
wire of which, according to Cable, 175 feet was used in the
unsuccessful effort to start the sump pumps in the tunnel.  R. at
2103.  Two of the sheets, according to Cable, show a total of
seven hours a Metro Electric employee devoted to activity at the
property on June 8 and 9, 2006.  R. at 2104-05.  The fourth
sheet, according to Cable, shows that from July 27 to August 2,

27

2006, an employee of Metro Electric devoted 11.1 hours of time to activity at the property. R. at 2106. The fifth sheet, which is dated August 2, 2005, shows, according to Cable, rental by Metro Electric of a lift for use at the property for inspection and evaluation of exterior lighting. R. at 2107. Metro Electric did not produce any invoice showing a charge for any of the activities in which it claims it engaged on the property before September 1, 2006.

Of interest is the testimony given by Cable concerning three estimates that Metro Electric prepared for Debtor, at Boggan's request, in the summer of 2006 of the anticipated cost of doing the work that would be required to restore the electrical system if Debtor purchased the property for renovation/restoration. The estimates collectively were marked Exhibit 100. R. at 2022-25. One dated August 30, 2006, shows a total cost of $846,062.28 for the electric work that would be done if Debtor chose to purchase the property and undertake the renovation/restoration project. R. at 2022-23. The other two estimates, each dated June 13, 2006, are alternative estimates of cost for replacement of the main switchboard at the Hospital, depending on the type of equipment used. R. at 2024-25. The interesting thing is that Cable testified that work he claims employees of Metro Electric did at the property before September 1, 2006, was not charged to

Debtor but, instead, was included in the estimates.  R. at 3456-57, 3477.  The thrust of Cable's testimony on that subject , at least as to the claimed switchgear work, was a concession that the time he claims Metro Electric employees devoted to the work before September 1, 2006, was time they spent assisting Metro Electric make estimates of the cost of renovation/restoration of the Hospital's electrical system if Debtor were to purchase the property and undertake to renovate and restore it.  R. at 3456-57, 3477.

Cable testified that the switchgear he said Metro Electric worked on before September 1, 2006, did not stay in the final building, and that the wire that was run to the sump pumps in the tunnel probably would not stay there.  R. at 3508.  The work they did on the outside lights was merely to check to see if there was any power to the lighting fixtures and then to screw bulbs into the fixtures to see if they were working.  R. at 3510-11.

Giving Cable's testimony the best spin for Metro Electric possible, it would prove no more than that Metro Electric, at the behest of the prospective purchaser of the property, engaged in preliminary or preparatory activities on the property that could lead to the purchase of the property and an ultimate firm plan for renovation and restoration of the structures on the property.

When the court considers all of the evidence related to the
inception date of Metro Electric's lien, the facts and inferences
point so strongly and overwhelmingly in favor of Lenders that the
court concludes that a reasonable fact finder could not arrive at
any finding or conclusion other than that the inception of Metro
Electric's mechanic's lien was after September 1, 2006.  No
reasonable fact finder would find that Metro Electric did any
work on the premises before September 1, 2006, that was a
permanent part of the proposed renovation/restoration project,
much less would any reasonable fact finder find that whatever
work Metro Electric might have done on the property before
September 1, 2006, would have been visible evidence from a
reasonable inspection of the property that the proposed
renovation/restoration project had commenced.  There is no
evidence that a potential mortgagee, such as MetroBank, who had
gone on the property to inspect it on August 31, 2006, would have
seen anything that would have told it that a
renovation/restoration project was under way.

     3.    <u>The Record Does Not Support Findings Leading</u>
         <u>to a Conclusion That IPS's Lien Claim Had its</u>
         <u>Inception Before September 1, 2006</u>

The court is not considering under this sub-subheading
issues related to the stipulation made in the name of IPS in
November 2009 that IPS "performed its first visible work or

30

delivered its first visible materials (as defined in section
53.124 of the Texas Property Code and Texas case law) . . . on or
after October 9, 2006 . . . ."  R. at 5629.  IPS was not a party
to the bankruptcy court proceedings.  However, Hajoca/Easter, as
an assignee of a part of IPS's mechanic's lien, advocated in
support of IPS's lien in those proceedings.  Thus, to that
extent, IPS, through its assignee, was attempting in the
bankruptcy court proceedings to prove the facts necessary to
establish that IPS's lien had priority over Lenders' liens.

As was true with Metro Electric, the credible evidence in
the record is that before the September 1, 2006, perfection of
Lenders' liens, IPS did not do any work or deliver any material
as a part of the commencement of the renovation/restoration
project; and, even if the evidence of questionable credibility
that IPS did work of some kind on the property before
September 1, 2006, were to be accepted as truthful, there is no
evidence that would support a finding that any such activity was
more than preliminary or preparatory or that any such activity
would have been visible from an inspection of the land as
evidence that the renovation/restoration project had commenced.

Boggan testified that the construction work on the
renovation/restoration project began around October or November
2006; that the first thing they did was to clean up; and that the

clean-up started in September 2006.  R. at 3123-24.  He said that
some of the lien claimants were on the site before September 1,
2006, to provide evaluations of what was needed to repair or
replace certain things.  No construction was started before
September 1, 2006.  R. at 3137-38.  IPS was the first company to
do plumbing work at the property.  R. at 3134.

When Boggan first visited the property in May 2006 there was
no water to the facility.  R. at 3203.  He was at the facility
when the water was turned on in September in an attempt to get
one of the bathrooms working.  R. at 3204-06.  Boggan testified
that there was not a bathroom working at the facility before
September 2, 2006.  R. at 3292.

Glenn Smith ("Smith"), the owner and president of IPS, R. at
2792(4), first testified by deposition.  He said that he believes
IPS was first on the Hospital project in July or August 2006, but
he was unable to locate any document supporting that statement,
R. at 2794(12-13).  Smith said Boggan is the one who walked them
through the facility to see what needed to be done and to say how
he wanted them to proceed, and he believes he told Boggan that
the work he requested would cost about $10,000.  R. at 2795 (16-
17).  He said that he gave the attorney for Hajoca/Easter all the
documents, including the one that would have shown the invoice
for $10,000, six months or so earlier.  R. at 2795(17-18).

When Smith was at the building, the building had been vandalized, quite a bit of stuff was missing, and they "were just trying to get the water on" and that [the $10,000] was "[their] estimated cost of getting the water back on."  R. at 2796(20-21).

Smith said that he did not acquire a building permit for the work he has described, and that if he had been doing work of a permanent nature, a building permit would have been required.  R. at 2803(51).  At a later point in Smith's deposition, he referred to the $10,000 item as being "an estimated cost to get the water back up for them" and that it was a "not to exceed" invoice.  R. at 2806-07(63-64).  When further questioned about the $10,000 item he said was available but that he had not brought with him, he explained:

> A.  When I started the project, I might have told him not to exceed $10,0000.  When I started trying to restore the water, I got to $10,000, I gave him the bill.  I said, here's what we got to do next.

R. at 2808(70).

When the document showing a $10,000 cost finally was produced and discussed during Smith's trial testimony, it turned out to be an invoice of IPS showing the "Date of Order" to  be 9/14/06, showing an amount of $10,000 for restoration of water to Hospital, clearing all drains as necessary, repairing leaks as found, and assessing condition of plumbing system.  R. at 1810.

The trial testimony given by Smith did not change the tenor of his deposition testimony.  The thrust of it was that he claimed that IPS did work on the project before September 2006 that consisted basically of the same things he described during his deposition testimony.  He added that in doing that work he supplied materials in form of copper, cast iron, and miscellaneous fittings to restore the water and drain system.  R. at 3554.  He said that the work he described was completed between the end of July and the end of August, and that at that time they were evaluating "what was going to be the next step, but IPS was not doing any work at that point in time -- they had been pulled off for a little while."  R. at 3573-74.  Smith reiterated that the work he claims was done before September 2006 was temporary work, and that he could not say that it was going to stay in the final building, and he emphasized that he did not have a building permit for that work, and he would have been required to have had one if it was final work that was going to stay in the finished building.  R. at 3584.  Smith summed up his contentions relative to the work he says was done before September 2006 by giving the following answer to a question of

the bankruptcy judge asking the witness to tell him again exactly

what IPS did:

>THE WITNESS: We were trying to -- they wanted to,
>you know, just kind of look at the general condition.
>We were trying -- you know, a lot of times, you could
>just go out there and turn the water on, everything's
>cool.  Maybe a few leaks; you patch it up.  The more
>that we got into it, you know, the longer it took.  And
>it just -- so we basically said -- you know, they were
>wanting to know, well, what's it going to take to do
>it?  We said, hey, about ten grand, and we could at
>least get the water back on.  That was through my
>supervisor's assessment that was out there.  And so
>that's what we did.  We were just evaluating getting
>the water -- trying to bring the water back on to the
>system, trying to get at least one working bathroom out
>there, because they did have workers out there and that
>was Dan's -- the owner's request, was us to get the
>water back up and get a bathroom working.

>THE COURT:  Okay.  And did you install any sinks
>or toilets or anything like that?

>THE WITNESS:  There was a bunch of old fixtures
>there, and basically we were trying to take an existing
>bathroom and get water to it and get it to function --

>THE COURT:  Okay.

>THE WITNESS: -- without bringing new stuff.  Other
>than copper fittings, you know, miscellaneous fittings
>and what we --

>THE COURT: Okay.

>THE WITNESS:  -- needed to, you know --

>THE COURT:  You sort of repaired the piping, then?

THE WITNESS:  Yes, sir.

R. at 3596-97.  By way of further explanation, he gave the

following answers:

> Q.  In response to the Court's question, you said you
> were out there evaluating the project?
>
> A.  Evaluating it, yes, sir, and working at the same
> time.
>
> Q.  Evaluating to see what needed to be done, correct?
>
> A.  Yes, sir.
>
> Q.  And in order to evaluate it, you had to do some of
> these minor fixes, correct?
>
> A.  We had to start trying to restore the water to the
> system.
>
> Q.  Because you couldn't evaluate it without restoring
> the water?
>
> A.  Correct.
>
> Q.  Because you couldn't find out where the leaks were?
>
> A.  Correct.
>
> Q.  So the purpose of doing all of this was to evaluate
> it so you could tell the owner what he was going to
> need to do in order to make -- to do the actual work on
> the project?
>
> A.  And to get a working bathroom.

R. at 3598-99 (emphasis added).

The court concludes that, considering all the evidence, no

reasonable fact finder could arrive at a finding that before

September 2006 IPS did work or supplied material that was a part

of the Hospital renovation/restoration project.  Even if IPS is
given the benefit of the doubtful assumption that it did work of
some kind on the project before September 1, 2006, the court is
satisfied that no reasonable fact finder, considering all of the
evidence, would find that before September 1, 2006, IPS engaged
in any activity on the property that was not merely preliminary
or preparatory work.  Moreover, certainly no reasonable fact
finder, considering all of the evidence, could find that any
activities of IPS on the property before September 1, 2006, would
be visible in the sense that a person inspecting the property,
such as a prospective lender, would see anything to cause the
observer to think that any activity of IPS was a part of the
renovation/restoration project that Debtor proposed to accomplish
once it acquired ownership of the property on August 31, 2006.

    4.   <u>Interim Conclusions</u>

For the reasons given above, the court concludes that the
bankruptcy court clearly erred (a) in its findings that Metro
Electric and IPS (acting through Hajoca/Easter) carried their
respective burdens of proof to establish that their mechanic's
liens had inception dates before September 1, 2006, (b) in ruling
that the liens of Metro Electric and IPS had priority over the
liens of Lenders, (c) in failing to rule that the liens of
Lenders had priority over, and were superior to, the mechanic's

liens of Metro Electric and IPS, and (d) in ruling that Lenders were liable to Metro Electric in the amount of $1,450,621.31, plus court costs and post-judgment interest.[12]

B.   Issues on Appeal Pertaining to the Stipulations of the M Lien Claimants

The stipulations of the M Lien Claimants are the subject of Lenders' Issue One, supra at 11, and Crescent's Issue Two on its cross-appeal, supra at 12-13.  In the document titled "Mechanics and Materialmen's Lien Claimants' Stipulations" filed November 23, 2009, a stipulation was made in the name of IPS that the date on which it "performed its first visible work or delivered its first visible materials (as defined by section 53.124 of the Texas Property Code and Texas case law) was on or after . . . October 9, 2006," R. at 5629, ¶ 9, and Crescent stipulated that the date on which it "performed its first visible work or delivered its first visible materials (as defined by section 53.124 of the Texas Property Code and Texas case law) was on or after September 2, 2006 . . . ."  R. at 5628-29, ¶ 7.

_____

[12]Lenders did not expressly include in their brief as an issue presented for review a complaint relative to the money judgment rendered by the bankruptcy court against them in favor of Metro Electric. Language on page 16 of their brief ("Issue Four, concerning the error of the bankruptcy court in rendering a personal judgment against FNB and MetroBank, or questions of law, subject to de novo review"), and their request on page 27 that this court render judgment that "Appellees shall take nothing of and from Appellants," clearly disclose the intent of Lenders to complain on appeal of the money judgment rendered against them in favor of Metro Electric.  In any event, reversal of the money judgment necessarily would follow from a ruling in favor of Lenders on Lenders' Issue Three.

The stipulations document recites that the stipulations are "for the purpose of Lender's Summary Judgment Motion."  R. at 5628.  Lenders maintain that the limiting language in the stipulations does not prevent the stipulations from having a binding effect on the stipulating M Lien Claimants, while Crescent and Hajoca/Easter maintain that the stipulations should not have been given any effect by the bankruptcy court in its rulings following the trial.  IPS and Hajoca/Easter each maintains that IPS is not bound by the stipulation made in its name because it did not make the stipulation and the attorney who purported to make the stipulation on its behalf had no authority to do so and was not even its attorney when the stipulation was made.

Inasmuch as the court has concluded that, in fact, IPS's mechanic's lien did not have its inception before September 1, 2006, the effectiveness of the stipulation made in IPS's name becomes a nonissue.  The bankruptcy court gave effect to the stipulation made in IPS's name insofar as the stipulation affects Hajoca/Easter's assigned interest in IPS's mechanic's lien claim. Hajoca/Easter indirectly complains of that action of the bankruptcy court by its Issue One on cross-appeal, supra at 13. Again, the answer to that question is not outcome determinative because of the conclusion reached by the court that Hajoca/Easter

failed to establish in the bankruptcy court that IPS's mechanic's lien, in which Hajoca/Easter had an assigned interest, had its inception before September 1, 2006.

If the court were required to make a ruling on the effect of the language in the stipulations of the M Lien Claimants that they were for the purpose of the motion for summary judgment, the court would rule in favor of Lenders on that question inasmuch as Lenders clearly were entitled to summary judgment on the basis of the stipulations against the M Lien Claimants who stipulated to facts establishing that their lien claims had inception dates after September 2, 2006; and this court's interpretation of the bankruptcy court's rulings is that the bankruptcy court properly held those parties to their stipulations at the summary judgment stage and as the controversy progressed to and through the trial stage. <u>Supra</u> at 5-7.

And, were the court required to make a ruling as to whether IPS is bound by the stipulation by virtue of it having been made by Hajoca/Easter, through its attorney, in IPS's name, the court would rule in favor of Lenders based on the privity existing between IPS and Hajoca/Easter by reason of the assignment by IPS to Hajoca/Easter of an interest in IPS's mechanic's lien. <u>See, e.g.</u>, <u>Sprint v. APCC Servs., Inc.</u>, 554 U.S. 269 (2008).

Even if the stipulations were to be disregarded as to
Crescent, Crescent's Issue Two on cross-appeal could not be
sustained because, in any event, no evidence was received at
trial that would support findings by a reasonable finder of fact
of the facts that would have to be found to exist for Crescent's
mechanic's lien to have an inception date before September 1,
2006.

C.   Hajoca/Easter's Cross-point Complaining of the
     Bankruptcy Court's Failure to Render a Money Judgment
     in Favor of IPS

Hajoca/Easter's Issue Two on cross appeal, supra at 13-14,
complains of the failure of the bankruptcy court to render a
money judgment in favor of IPS against Lenders in the amount of
IPS's mechanic's lien of $509,195.26.  Apparently Hajoca/Easter
presents this issue on its own behalf, as an assignee of IPS of a
part of IPS's mechanic's lien claim, as well as on behalf of IPS.
As to the latter aspect, the court finds puzzling that the
attorneys for Hajoca/Easter in one breath maintain that they were
not attorneys for IPS and had no authority to act on its behalf,
yet in another they seek to recover hundreds of thousands of
dollars on behalf of IPS.  Be that as it may, the complaint made
by Hajoca/Easter's Issue Two has been resolved against
Hajoca/Easter by the court's determination that the record does

not support findings that would lead to a conclusion that IPS's mechanic's lien has priority over Lenders' liens.

D.    Crescent's Issue One on Cross-appeal Based on its
      Contractual Relationship with Metro Electric

Crescent's Issue One on cross-appeal, _supra_ at 12, contends that the inception date of its lien should relate back to the inception date of Metro Electric's lien by virtue of the fact that Crescent contracted directly with Metro Electric to supply materials to the latter on the subject project. This issue assumes that the ruling of the bankruptcy court that Metro Electric's lien had an inception date before September 1, 2006, was sound. Inasmuch as that ruling is being reversed, the claim of error made by Crescent's Issue One is without merit. Moreover, the court has not been able to find any authority that would support Crescent's position that the supplier of material to a contractor on the project causes the material supplier's lien to relate back to the inception date of the contractor's lien if the construction project is not being conducted under the umbrella of a general contractor/owner relationship, a relationship that the bankruptcy court correctly found did not exist on the project in question.

IV.

## Conclusions, and Rulings

For the reasons given above, the court, after due regard of the opportunity of the bankruptcy court to judge the credibility of the witnesses, has reached the following conclusions, and is making the following rulings;

1.   All findings, conclusions, and rulings of the bankruptcy court suggesting, or adjudicating, that Metro Electric's mechanic's lien had priority over the liens of Lenders are clearly erroneous, and are to be reversed.  After having reviewed the entire record on appeal, the court is left with the definite and firm conviction that the bankruptcy court committed a mistake with respect to each of such findings, conclusions, and rulings.

2.   The liens of Lenders have priority over, and are superior to, the mechanic's lien of Metro Electric, the bankruptcy court erred in failing to so rule, and the court is to render judgment to that effect.

3.   All findings, conclusions, and rulings of the bankruptcy court suggesting, or adjudicating, that Metro Electric is entitled to a judgment against Lenders, jointly and severally, in the amount of $1,450,621.31, plus court costs and post-judgment interest, are clearly erroneous, and are to be reversed;

and, a ruling is to be rendered that Metro Electric is denied any recovery from Lenders.  After having reviewed the entire record on appeal, the court is left with the definite and firm conviction that the bankruptcy court committed a mistake with respect to each of such findings, conclusions, and rulings.

4.   All findings, conclusions, and rulings of the bankruptcy court suggesting, or adjudicating, that IPS's mechanic's lien had priority over the liens of Lenders are clearly erroneous, and are to be reversed.  After having reviewed the entire record on appeal, the court is left with the definite and firm conviction that the bankruptcy court committed a mistake with respect to each of such findings, conclusions, and rulings.

5.   The liens of the Lenders have priority over, and are superior to, the mechanic's lien of IPS, the bankruptcy court erred in failing to so rule, and the court is to render judgment to that effect.

6.   The bankruptcy court erred in overruling the objections of Lenders to the mechanic's liens of Metro Electric and IPS, and the court is to render judgment to that effect.

7.   The bankruptcy court gave effect to the stipulation in the name of IPS concerning the date when it performed its first visible work or delivered its first visible materials, as such stipulation affected Hajoca/Easter as IPS's assignee; and, the

44

bankruptcy court did not err in giving effect as to such stipulation as it relates to the interest in IPS's mechanic's lien asserted by Hajoca/Easter through assignment from IPS.

8.    The bankruptcy court did not err in failing to render a money judgment in favor of IPS against Lenders.

A judgment consistent with the conclusions and rulings expressed above is to be entered.

THE COURT SO ORDERS.

SIGNED March 12, 2012.

JOHN McBRYDE
United States District Judge